In the Matter of CARL WALKER, Appellant, v CARMEN SHANG, as Acting Commissioner of the New York State Department of Social Services, et al., Respondents.

Second Department, January 22, 1979

### APPEARANCES OF COUNSEL

*Leonard S. Clark (Douglass J. Seidman* of counsel), for appellant.

*Louis J. Lefkowitz, Attorney-General (Gerald Slotnik, Herbert J. Wallenstein* and *Samuel A. Hirshowitz* of counsel), for State Commissioner, respondent.

*Edward G. McCabe, County Attorney (Robert O. Boyhan* of

counsel; *Kathryn E. Driscoll* on the brief), for County Commissioner, respondent.

## OPINION OF THE COURT

SHAPIRO, J.

In this CPLR article 78 proceeding, the petitioner appeals from a judgment dismissing his petition which, *inter alia,* requested the court to compel the respondents to reduce the mortgage lien on his home to reflect the amount he earned by reason of his work on a public works project. The petitioner was assigned to work on the public works project as an employable recipient of home relief in accordance with the provisions of section 164 of the Social Services Law. The judgment should be reversed and the proceeding remitted to Special Term to determine the amount earned by petitioner on the public works project and to direct respondents to reduce the lien on petitioner's home by that amount.

### THE ISSUE

Section 106 of the Social Services Law requires the social services officials responsible for the administration of home relief to take a mortgage lien (or a deed) on any real property owned by the person to whom public care and assistance is given. The novel issue raised on this appeal is whether payment for the number of days worked by an employable home relief recipient assigned to a public works project pursuant to section 164 of the Social Services Law to enable him, as section 164 (subd 3, par [b]) provides, "to earn" up to "the amount of the budget deficit of the recipient and his family computed on local home relief budget schedules", must be credited against such a mortgage lien.

### STATEMENT OF THE CASE

The undisputed facts here are that petitioner-appellant and his wife reside in their own jointly owned home, which has an approximate value of $45,000 and on which the monthly mortgage payment is $154. From June, 1975 to the end of March, 1977 petitioner was on home relief. His wife also received home relief from June, 1975 to August 31, 1975. On the latter date she began to receive Supplemental Security Income (SSI) on the basis of a disability. Pursuant to section 106 of the Social Services Law, the Department of Social

Services of Nassau County (the county agency) obtained from the petitioner and his wife a bond and mortgage on their home dated June 27, 1975. In that bond and mortgage the petitioner and his wife acknowledged that they were indebted to the mortgagee in the sum of $7,500, "or so much as has been advanced or may be advanced by the mortgagee for the relief of the mortgagor[s] or for the benefit of the mortgagor[s] or on account of the mortgagor's [sic] liability under the provisions of the Social Welfare Law of the State of New York" and agreed to pay to the mortgagee "the amount expended by said mortgagee for the relief of the mortgagors, or for the benefit of the mortgagors or on account of the mortgagors' liability under the provisions of the Social Welfare Law of the State of New York and for repairs and taxes on the hereinafter described property".

From July 31, 1975 to February, 1977 petitioner, as an employable recipient of home relief, was required, as provided in section 164 of the Social Services Law, to perform work assigned to him by the county agency. The assigned work was as a custodian in the Elmont school system and later the Malverne school system. In accordance with the provisions of section 164 (subd 3, par [b]) of the Social Services Law and 18 NYCRR 385.10 (f) (2), he worked the number of days necessary to earn the amount "determined by the amount of the budget deficit" of his family computed on local home relief schedules. The hourly rate of payment credits for the work he performed was computed for part of the time, as provided in the regulations of the State Department of Social Services, at the then State minimum wage of $2.40 per hour, and for the balance of the time at the higher hourly wage paid to regular employees for comparable work, $3. During the period petitioner worked on this public works project he put in 1,529.5 hours, and the total payment credits he claims he earned thereby were $4,365. During the period petitioner was on home relief, he received from the county agency a total of $5,794.95. Since April 1, 1977 petitioner has received no public assistance, because the salary he then began receiving from his employment as a custodian in the Malverne School District and the SSI payments his wife was receiving, were sufficient to maintain his family.

In February, 1977 petitioner applied to the county agency for a reduction of the mortgage lien by the amount of the

payment credits he had earned through his employment on the public works project. His application was denied.

In a letter dated April 11, 1977, petitioner's counsel wrote respondent D'Elia that petitioner, in February, 1977, had requested a fair hearing on the issue of his right to have the lien on his home reduced by the extent of the money he earned while working on the public works project but that no hearing was held because he and petitioner were informed by the county agency's fair hearing representative that no decision had been made on the petitioner's request to the county agency and hence there was no issue to be reviewed at the hearing. Petitioner's counsel stated that he had agreed to write D'Elia for a "definitive statement" of the county agency's position. A copy of that letter was sent to a member of the New York State Department of Social Services (the State agency).

The county agency responded in a letter dated May 26, 1977: "Participation in the Public Works Project is a requirement for eligibility for those persons receiving home relief or aid to dependent children. Those engaging in this program are deemed employable but not employed, in accordance with the Social Services Law §§ 131, 350 (k). Any money earned from the program is not utilized to reduce a lien or mortgage held by our Agency. The only way in which such can be discharged is by repayment." However, in a letter dated June 10, 1977, respondent Carmen Shang, then General Counsel of the State agency, advised the writer of the county agency's letter as follows:

"This is to confirm your recent conversation with Mr. Kellogg of my staff in regard to certain recent correspondence relating to reduction in the amount of the principal owing on a mortgage held by the Nassau County Department of Social Services against certain real property owned by Carl Walker, a former Home Relief recipient. You were advised that, in the opinion of this Office, prior to the effective date of Section 8 of Chapter 77 of the Laws of 1977 persons participating in public works projects should be considered to be 'working off' their grants. Accordingly, in our opinion, it is proper for your agency to reduce the amount owing to your agency on Mr. Walker's mortgage. Regardless of the disposition of Mr. Walker's mortgage, I note that the hearing request made by Mr. Walker's attorney was improperly made inasmuch as the

grievance at issue is not one of those set out in 18 NYCRR 358.4.

"Thank you for your prompt attention in this matter."[1]

In a letter dated June 29, 1977, petitioner's counsel, who had received a copy of respondent Shang's letter, advised the State agency:

"I have contacted the Nassau County Department of Social Services to ask them to reduce Mr. Walker's lien accordingly. However, I have been informed that the Nassau Agency disagrees with your ruling and refuses to reduce its lien on my client's property.

"Since you do not believe that this matter may be pursued by an administrative hearing, I will be forced to pursue this matter in court if action to resolve this matter is not forthcoming in the next few weeks. I ask you to secure the Nassau Agency's compliance with your ruling to insure that Mr. Walker and all others similarly situated to him in Nassau County are given proper credit for their public works project participation."

In a letter dated September 23, 1977, the State agency replied to the letter from petitioner's counsel:

"You should be aware that the discussion of the question of whether participation in PWP can reduce the amount of an agency lien is by no means one-sided. The legislative history of Chapter 714 of the Laws of 1959, which enacted Section 164 of the Social Services Law, does not speak of any intent to reduce agency liens because of participation in public works projects. Rather, this Office's opinion is based on the inference raised by the tying of working hours to grant size and the equitable considerations that a person who is compelled to participate in PWP should to some degree be compensated for his labors especially vis-a-vis a person not so compelled. On the other hand, as was pointed out by Mr. Rachlin of the

---

1. The reference in the letter to the State agency's belief that the matter could not be pursued by an administrative hearing stems from the position taken by that agency and iterated in its brief on this appeal that the regulation prescribing when fair hearings may be held (18 NYCRR 358.4 [a] [5]), does not authorize a fair hearing since here the petitioner sought such a hearing not with respect to "objections to department policy as it affects the applicant or recipient's situation", but solely to compel the State agency to take action to secure the county agency's compliance with its ruling in its letter of June 10, 1977. Petitioner's counsel, by letter dated May 6, 1977 directed to the State agency's Fair Hearing Section, had sought a fair hearing on the "Failure of Nassau County DDS to remove the lien placed on Mr. Walker's home. He worked for PWP for every dollar he received as a Home Relief recipient."

Nassau County Department of Social Services, whom we contacted after receipt of your letter, there is a strong line of argument stated in *Hedge vs Barbaro* and authorities cited therein which suggest that once a local social services official has exercised his discretion to create a lien, the lien exists to the full extent of public assistance and care received, subject to certain exceptions not herein relevant. Mr. Rachlin, quite understandably, is loathe to advise his Commissioner to release his lien on your client's property until some legal protection for his Commissioner is assured. To this end I have suggested to Mr. Rachlin that this Department will develop and publish a Regulation that expresses the policy contained in my letter of June 10. Upon receipt of comments and in conformance with the Administrative Procedure Act, we will review, amend, and promulgate our Regulation as we see fit. You will be mailed a copy of our proposed Regulation at the time its notice is published in the State Bulletin.

"Normally, this office is considerably less reticent in enforcing its opinion on local districts than in the instant case. However, the opinion herein at issue was never prepared for formal distribution and, consequently, outside sources were never fully consulted for their input. More importantly, the action of the legislature in passing Chapter 77 of the Laws of 1977 has given us good reason to reexamine our original inferences."

Petitioner then brought this CPLR article 78 proceeding, *inter alia,* to compel the respondents "to reduce the Nassau County lien on his house by the full amount petitioner earned through his public works assignment". The county agency filed a verified answer, but made no motion to dismiss the petition. The State agency, without answering, cross-moved to dismiss the petition for failure to state a cause of action against it.

Special Term dismissed the petition on the merits and denied the State agency's cross motion as moot. In its opinion the court cited *Hedge v Department of Social Servs. of Nassau County* (62 Misc 2d 839, 842) which, in an action for a declaratory judgment to determine whether the defendant had authority to compromise an existing mortgage under section 106 of the Social Services Law for less than the face amount of the mortgage, held that "the defendant [county agency] may not accept less from the plaintiff recipients of public assistance for the discharge of the mortgage than the 'full cost

of public assistance granted and repairs and taxes as well.'" Special Term declared *Hedge (supra)* "controlling here, although the facts in that case are distinguishable from the case at bar" and noted further that after *Hedge,* subdivision 2 of section 106 of the Social Services Law "was amended to permit the responsible social service official to contract for a redemption of the lien at a *lesser amount* than the full expenses incurred". Special Term also cited the following language from section 385.10 (subd [e], par [2]) of the State agency's regulations in effect at the time of the petitioner's request in February, 1977 for a fair hearing (former 18 NYCRR 385.10 [e] [2]):

"(e) The social services official shall * * *

"(2) require the recipient to work the number of days as determined by the amount of the grant, provided he shall not be required to work for more than the number of days necessary to earn such an amount or to be paid more than such an amount or to work more than eight hours in a day or more than 40 hours in one week, or the customary full work week of the employer, if less. However, the recipient will not be required to work off that portion of the grant which represents the allowance for expenses incident to participation in work relief. Payment credits for work shall be made at the State minimum wage or, if higher, at the wage paid to regular employees for comparable work". (Cf. 18 NYCRR 385.10 [f] [2].)

Declaring that the foregoing must be read in conjunction with sections 164 (subd 3, par [b]) and 106 of the Social Services Law as not permitting a reduction of a home relief lien, Special Term held that the petitioner had failed to show any right to relief. However, Special Term's reliance on *Hedge* (62 Misc 2d 839, *supra)* was misplaced since the issue here is not whether a home relief lien may be compromised or diminished but, rather, *what was the true expense incurred by the county agency in providing petitioner with home relief.* Was it the actual amount paid to the petitioner or was it that amount diminished by the amount of money he earned for work done for the county?

The answer cannot be found in the language of the pertinent statutes alone. Rather, it must be deduced from the legislative intent manifested by the language of the sections involved and in other provisions of the Social Services Law.

Highly relevant to any determination of the legislative

intent to be drawn from section 106 of the Social Services Law is the fact that it appears in title 6 of article 3 of the Social Services Law, which is entitled "Powers to Enforce Support". Section 104-a is entitled "Transfer of property for the purpose of qualifying for assistance; presumption." Section 104-b is entitled "Liens for public assistance and care on claims and suits for personal injuries." Section 105 is entitled "Claim on insurance." All those sections seek to insure that a person receiving public assistance who has or comes into assets which could be used for his maintenance holds or receives those assets subject to the claim of the local agency giving such assistance for reimbursement to the extent of its outlays *for the public assistance provided to that person.*

Section 106 of the Social Services Law deals with still another such situation, the handling of applicants for public assistance who are owners of real property. It authorizes the social services official responsible for the administration of assistance to accept a deed of real property or a mortgage thereon on behalf of the public welfare district for the assistance and care of a person at public expense. It permits redemption of such property by the payment of all expenses incurred for the support of the person and for repairs and taxes paid on such property.

When viewed in the context of the other provisions of the title it seems clear that section 106 is intended to deal with the problem of an applicant for public assistance (home relief in this case) whose assets are in a form which make them unavailable to him for immediate use without sacrificing a large amount of their value and the liquidation of which might run counter to the policy expressed in subdivision 3 of section 131 of the Social Services Law. That subdivision declares that families (1) as far as possible, shall be kept together (2) shall not be separated for reasons of poverty alone, and (3) shall be provided services to maintain and strengthen their family life, and that whenever practicable, assistance and service shall be given to a needy person in his own home. It is apparent that one of the aims of section 106 of the Social Services Law is to prevent the social services agency from being saddled with a large cost for providing shelter for a needy family which has an equity in its own home. The forced sale of this equity may well result in burdening the social services agency with much larger shelter costs for the applicants than would be the case if they were allowed to remain

in their homes. Thus, it was provided that the local agency could preserve a needy family's right to use its home by including in the public assistance grant the amount necessary to pay the mortgage payments and the necessary repairs and taxes on the home. Section 106, however, makes it clear that in taking a deed or a mortgage on real property owned by an applicant for public assistance, the social services official doing so is to receive a lien for no more than the total expenses his agency incurred for support of the owner of that real property and not windfalls which would accrue if the property increased in value. The legislative intent in enacting section 106 was to preserve, subject to the expenses incurred for public assistance, the nonliquid asset of the person consisting of his equity in the real property.

In a sense, in section 106 of the Social Services Law the Legislature did with respect to a nonliquid asset, such as an equity in a home, what section 104 of the Social Services Law did with respect to property hidden by an applicant; it translates any public assistance or care received by such a person into an implied contract allowing the public welfare official to recover up to the value of such property the cost of such assistance and care.

Thus we come to the question for decision here, to wit, the manner of computing the cost of the assistance and care given to the petitioner, who claims he "earned" $4,365 on the public works project, toward the total of $5,794.95 received by him and his wife as home relief. The language of the act which originally added section 164 to the Social Welfare Law (now the Social Services Law), with its public works project concept and the requirement for employables receiving home relief to accept such work as a condition of eligibility, gives us a specific statement of the legislative intent. The public works program was established by chapter 926 of the Laws of 1942. Section 1, of that chapter, as enacted, provided: "Legislative intent. In view of the continuing relief problem due to unemployment and the number of needy employable persons receiving home relief who cannot be given employment through the work projects administration either because they are ineligible under the law or the rules governing employment on projects of the work projects administration or because of lack of available jobs on such projects, *the legislature hereby declares that in its judgment it is advantageous to the public welfare that local authorities be authorized to provide home relief in*

*the form of wages for work relief on projects administered by local units of government.* In conferring such authority on local units of government it is the intention of the legislature that the counties, cities and towns shall utilize fully employment available for eligible recipients of home relief through projects maintained by the work projects administration and that the work relief projects carried on by a city, county or town under the authority hereinafter conferred shall be in addition to and not in lieu of projects of the work projects administration sponsored or to be sponsored by the county, city or town. Under the conditions and subject to the limitations hereinafter specified county and city public welfare districts and cities and towns responsible for administration of home relief shall be authorized to administer work relief." (Emphasis supplied.) This expression of legislative intent makes it clear that the payments to employable persons receiving home relief for work on public works projects should be in the form of wages and the work done should not be simply "make work" but should be work which "is advantageous to the public welfare".

In addition, section 5 of chapter 926 of the Laws of 1942, as originally enacted, like the provisions in the same section prior to its amendment in 1977 (L 1977, ch 77), makes it clear that the payments made for employables receiving home relief and working on public works projects should be in cash and at the rate paid for similar work being done by others, that the number of days of work to be required of each such person must be based on the amount of the budget deficit of the recipient and his family as computed on local home relief budget schedules and that no such person should be required to work more than the number of days necessary to earn such amount. Although it is true that section 7 of chapter 926 of the Laws of 1942, which dealt with the financing of work relief, specified that work relief wages shall be paid from funds appropriated for home relief, that provision cannot serve to erase the fact that the Legislature in section 164, from its inception, viewed the payments received by home relief recipients who were required to participate in work relief, as payments "in the form of wages" for work of *value* sponsored by the local agency. This conclusion is reinforced by the fact that section 164 (subd 3, par [b]) of the Social Services Law, in effect while the petitioner was on work relief, specifically provided that no person on work relief should be re-

quired to put in any more days of work than the number of days necessary to earn the amount to be paid as home relief.[2]

It seems reasonably clear, therefore, that the legislative intent in enacting section 164 of the Social Services Law was that an employable person receiving home relief would be required to perform work assigned to him by the social services agency furnishing such relief, but that the amount he received for his work should be treated as his earnings or wages. Hence, the action of the local agency (and its affirmance by the Special Term) in refusing to credit such earnings against the home relief received by petitioner is not only contrary to the legislative intent but it allows the county to receive from a needy person entitled to the aid, care and support of the State and its subdivisions under section 1 of article XVII of the New York State Constitution, not just what it had paid in home relief, but in addition, the value of the work he was compelled to perform under section 164 of the Social Services Law in order to receive home relief. Nothing in the statute shows a legislative intent that the giving of home relief should be accompanied by such a windfall to the local agency or to the public facility for which the work was performed. The ruling of Special Term, in effect, gives the county the benefit of the petitioner's labors *gratis*—a benefit for which the county would have had to pay someone else if petitioner had not done the work.

While our research has not turned up any decision in this State on the propriety of our interpretation of section 106 of

---

2. We are aware, of course, that the Legislature, in 1977 (L 1977, ch 77, § 8, eff May 1, 1977) repealed paragraph (b) of subdivision 3 and substituted a new paragraph (b) to be effective until March 31, 1978, which abandoned the language limiting the duty of an employable to working only for as long as what he earned was needed to cover the home relief his family received, and experimented with a new approach by providing that each employable person on home relief assigned to a public works project had to work an average of three days per week without regard to the amount of the budget deficit of the person or his family. That provision expired March 31, 1978 and the prior provisions of paragraph (b) of subdivision 3 were reinstated. Section 8 of chapter 77 of the Laws of 1977 was ruled unconstitutional in *Young v Toia* (93 Misc 2d 1005) as being violative of section 17 of article I and article XVII of the New York State Constitution. Section 17 of article I provides that no workman in the employ of a contractor engaged in performance of any public works project shall be paid less than the rate of wages prevailing in the same occupation in the locality within the State where the public work is used. Section I of article XVII provides that the aid, care and support of the needy are public concerns and shall be provided by the State and its subdivisions in such manner and by such means as the Legislature shall determine.

the Social Services Law, there have been cases in other jurisdictions which have denied recovery to the public agency of sums advanced to persons for public assistance where the sums sought by the agency failed to give due credit for work done or other services provided to the State or its subdivision by the recipient of such public assistance. There are a number of such rulings (see, e.g., *City of Marlborough v City of Lowell,* 298 Mass 271; 70 CJS, Paupers, § 76).

Our decision here is based on our interpretation of the legislative intent reflected in the relevant sections of the Social Services Law. We have no need, therefore, to deal with petitioner's contention that the failure to give him credit for his earnings while working on the public works project against the lien the county holds on his home is a form of involuntary servitude in violation of the Thirteenth Amendment to the Federal Constitution (but, see, *Matter of Barie v Lavine,* 48 AD2d 36, affd 40 NY2d 565).

We find it necessary to point out that the petitioner's claim has apparently fallen between two stools, the ruling of the county agency that section 106 of the Social Services Law bars the giving of credit for the work done by him against the lien that agency holds on his home, and the refusal of the State agency to either hold a hearing or make any effort to compel the county agency to comply with its (the State agency's) opinion that credit should be given against the county agency's lien on petitioner's home. The letter addressed to the county agency, dated June 10, 1977 and signed by the respondent Shang, then General Counsel of the State agency, clearly states said respondent's opinion that "it is proper" for the county agency "to reduce the amount owing * * * on Mr. Walker's [the petitioner's] mortgage." Later, after the amendment of section 164 of the Social Services Law (L 1977, ch 77), a representative of the State agency, while declaring that the State agency's opinion was "based on the inference raised by the tying of working hours to grant size and the equitable considerations that a person who is compelled to participate in PWP should to some degree be compensated for his labors especially vis-a-vis a person not so compelled", and advising the petitioner's attorney that the State agency would develop and publish a regulation that expresses the policy contained in the letter of June 10, nevertheless refused to enforce the opinion on the county agency, leaving the petitioner only the not very satisfying alternative of bringing the matter before

the courts.[3] When the matter did come before the courts the State agency continued its pattern of avoiding its responsibility by submitting a brief which did not deal with the important substantive issue involved, but which relief on the technical language of the regulation governing the granting of fair hearings; the State agency arguing that it had no duty to grant such a fair hearing. In so doing the State agency defaulted in its duty to help this court deal with the important issue of interpretation of the statutes here involved, an issue which is clearly likely to recur in the future and which should be resolved for the benefit both of persons in a status similar to that of the petitioner and of other local agencies holding liens against the real property of a recipient of public assistance under section 106 of the Social Services Law.

The judgment appealed from should be reversed and the proceeding remitted to Special Term to determine the amount earned by petitioner on the public works project and to direct the respondents to reduce the lien on petitioner's house by that amount.

HOPKINS, J. P., and GULOTTA, J., concur; MARTUSCELLO, J., dissents and votes to affirm the judgment.

---

3. The issue of whether the State agency has the power to enforce its interpretation of its regulations on a local agency has recently been resolved by the Court of Appeals in *Matter of Beaudoin v Toia (Jorczak)* (45 NY2d 343). In that case the unanimous court said *(supra,* p 347):

"In New York State, the social services program is a State program, administered through the 58 local social services districts under the general supervision of the State Department of Social Services and the State Commissioner of Social Services. (NY Const, art XVII, § 1; Social Services Law, §§ 17, 20, 34.) The county commissioners are denominated by statute 'agents' of the State department (Social Services Law, § 65, subd 3). In the administration of public assistance funds, whether they come from Federal, State or local sources, the authority and responsibility is that of the county commissioners of social services, not the counties; the local commissioners act on behalf of and as agents for the State. Each is a part of and the local arm of the single State administrative agency. Determinative of the present question is the status and function of the local commissioners as agents of the State and not of their respective counties.

"Inasmuch as the local commissioners are agents of the State department they may not substitute their interpretations of the regulations of the State department for those of the State department or the State commissioner *(Matter of Samuels v Berger,* 55 AD2d 913; *Matter of Bonfanti v Kirby,* 54 AD2d 714; *Matter of Barbaro v Wyman,* 32 AD2d 647). To recognize any such right would be to undermine the supervisory authority of the State commissioner and to invite administrative chaos."

Hence, it is unlikely that the State agency's failure to take action against the county agency's defiance of its ruling, as occurred here, is likely to recur in the future.

Judgment of the Supreme Court, Nassau County, entered March 23, 1978, reversed, on the law, without costs or disbursements, and proceeding remitted to Special Term for further proceedings in accordance herewith.